# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| McCALL WEDDINGS, LLC, an Idaho Limited Liability Company; and DELISH CATERING, LLC, an Idaho Limited Liability Company,<br><br>     Plaintiffs,<br><br>v.<br><br>McCALL WEDDING AND EVENT DIRECTORY, LLC dba MCWED, an Idaho Limited Liability Company; SOIREE, LLC, an Idaho Limited Liability Company; SHERRY SCHELINE, an Individual; and JOHN DOES I-X,<br><br>     Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No.: 1:14-cv-00315-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANT SOIREE, LLC'S MOTION FOR SUMMARY JUDGMENT**<br>**(Docket No. 38)**<br><br>**DEFENDANT SOIREE, LLC'S MOTION FOR SANCTIONS PURSUANT TO RULE 11**<br>**(Docket No. 37)** |

Now pending before the Court is Defendant Soiree, LLC's ("Soiree") (1) Motion for Summary Judgment (Docket No. 38), and (2) Motion for Sanctions Pursuant to Rule 11 (Docket No. 37). Having carefully reviewed the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.  RELEVANT BACKGROUND

Plaintiff McCall Weddings, LLC ("McCall Weddings") provides wedding and event planning services largely through the use of its Internet website, *mccallweddings.com*. In this lawsuit, McCall Weddings[1] contends that Defendant McCall Wedding and Event Directory, LLC

---

[1]  Delish Catering, LLC ("Delish") is also a Plaintiff in this action. Unless otherwise indicated, Plaintiffs McCall Weddings and Delish will be referred to collectively as either McCall Weddings or Plaintiffs.

**MEMORANDUM DECISION AND ORDER - 1**

("McWed") and its principal Sherry Scheline[2] are providing wedding planning services in competition with McCall Weddings and in doing so have infringed upon McCall Weddings's servicemark/trademark, "McCall Weddings."  Specifically, McCall Weddings claims that McWed publishes (both "virtually" on its website, *mccallwed.com*, and in more conventional print format) a wedding and event planning magazine/directory – also called "*McWed*"[3] – which advertises its services in ways that infringe upon McCall Weddings's marks.  *See, e.g.*, Am. Compl., ¶ 23 (Docket No. 5) ("Defendants' wrongful acts have permitted and will permit Defendants to wrongfully attract business in wedding planning and to make advertising sales based upon the strength of Plaintiff's reputation and the substantial goodwill that Plaintiff has built up in its "McCall Weddings" trade name and mark.").

McCall Weddings also alleges that Defendant Soiree, LLC ("Soiree") "has participated directly" in *McWed's* publication while also engaging in wedding and event planning.  As to Soiree, Plaintiffs make four claims: (1) unfair competition and false designation of origin in violation of the Lanham Act ("First Claim"); (2) common law trademark infringement ("Second Claim"); and (3) unfair competition and false advertising in violation of Idaho Code sections 48-603(1) and 48-603(2) ("Fourth Claim" and "Fifth Claim").[4]  Soiree, however, says that it played no part in publishing *McWed*, and Soiree brings its own counterclaims for declaratory relief and breach of contract based upon an alleged settlement agreement between it and Plaintiffs.

---

[2]  Unless otherwise indicated, Defendants McWed and Scheline will be referred to collectively as McWed.

[3]  "*McWed*" – the magazine/directory – will be italicized when referred to in this decision. "McWed" – the party – will not.

[4]  McCall Weddings and Delish bring separate claims for unfair competition and false advertising in violation of Idaho Code sections 48-603(1) and 48-603(2) – hence the two claims.

**MEMORANDUM DECISION AND ORDER - 2**

Soiree now seeks summary judgment on all of Plaintiffs' claims and its counterclaims. Soiree contends (1) there is no evidence that it falsely designated any of McCall Weddings's purported marks and, thus, the Lanham Act claim (First Claim) must be dismissed; and (2) without such a claim anchoring the balance of claims asserted against it, the corresponding state law claims (Second, Fourth, and Fifth Claims) must likewise be dismissed.[5]  Soiree seeks summary judgment on its counterclaims, arguing that such claims were resolved in a valid and enforceable settlement agreement.

## II.  DISCUSSION

### A.    Soiree's Motion for Summary Judgment (Docket No. 38)

####    1.    Legal Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to a *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

---

[5]    Soiree also contends that Plaintiffs' claims are frivolous, separately moving for sanctions pursuant to Rule 11.  *See* Mot. for Sanctions (Docket No. 37).

**MEMORANDUM DECISION AND ORDER - 3**

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *See id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence, but may simply point out the absence of evidence to support the nonmoving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). This then shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *See Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

2.   <u>There is no Genuine Issue of Material Fact to Support a Claim that Soiree Has Violated the Lanham Act</u>

Section 43(a) of the Lanham Act provides in relevant part:

> Any person who, on or in connection with any goods or services . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

**MEMORANDUM DECISION AND ORDER - 4**

Plaintiffs allege infringement of their "McCall Weddings" mark by McWed's use of various advertising/social media mechanisms, including (1) *mccallwed.com*, (2) *mccallwed@gmail.com*, (3) *facebook.com/mccallwed*, (4) *twitter.com/mccallwed*, and (5) *#mccallweddings* – Plaintiffs essentially argue that McWed's use of these platforms represents an infringing use of Plaintiffs' "McCall Weddings" mark and is likely to cause consumer confusion in violation of the Lanham Act. *See generally* Mem. in Supp. of Mot. for Prelim. Inj. (Docket No. 25); *see also* First Am. Compl., ¶ 20 (Docket No. 5). According to Plaintiffs, this is particularly evident through McWed's use of the above marks throughout its magazine/directory, *McWed*. These allegations pertain to McWed to be sure; however, Plaintiffs allege they implicate Soiree insofar as Soiree had a hand in *McWed's* publication too. *See* First Am. Compl., ¶¶ 7, 15, 38, & 48 (Docket No. 5). This is reflected in Plaintiffs' counsel's letter to Soiree's counsel at the action's outset:

> Attached to this letter please find a Complaint my clients has filed against your company, Soiree . . . and Sherry Scheline and McWed. The gist of the Complaint is that you are liable for the trademark infringement and unfair competition arising from trademark infringement in the *McWed* magazine as well as the misleading use of photographs of my clients' coordinated weddings that are presented as though you and/or McWed and/or Sherry Scheline coordinated and/or planned the weddings. In sum, the use of the infringing material throughout this magazine has been directing business away from my clients and to your company, McWed, and Sherry Scheline. You have been functioning directly as an operator of the magazine through your direct contributions throughout the magazine as an editor as well as your participation as a "partner," thus legally my clients are of the opinion that your company is responsible for the infringement and unfair competition in addition to Sherry Scheline and her company.

8/19/14 Ltr., attached as Ex. B to Schossberger Aff. (Docket No. 37, Att. 17). It is against this setting that Plaintiffs' Lanham Act claim against Soiree is framed.

**MEMORANDUM DECISION AND ORDER - 5**

Plaintiffs agree that proof of a false designation of origin claim against Soiree requires that they establish that (1) the terms in question are valid and protectable trademarks; (2) Plaintiffs own these marks as trademarks; (3) Plaintiffs used these marks in commerce; and (4) Soiree used false or misleading descriptions of fact or "'terms or designs similar to [Plaintiffs'] marks without the consent of [Plaintiffs] in a manner that is likely to cause confusion among ordinary purchasers as to the source of the goods [or services].'" *See Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1049 (N.D. Cal. 2010) (citing 15 U.S.C. § 1125(a); *Chimney Safety Inst. of Am. v. Chimney King*, 2004 WL 1465699, *2 (N.D. Cal. 2004)).  At issue here is this last element – whether Soiree improperly used or falsely designated any of Plaintiffs' claimed marks.  *See* Reply in Supp. of MSJ, p. 3 (Docket No. 59).

Soiree says there is no such evidence; Plaintiffs disagree, pointing to *McWed's* allegedly infringing references to their marks and Soiree's involvement with *McWed's* publication. *Compare* Mem. in Supp. of MSJ, pp. 9-11 (Docket No. 38, Att. 1), *with* Resp. to MSJ, pp. 3-6 (Docket No. 45).  Plaintiffs loosely claim that Soiree, McWed, and Ms. Scheline were/are partners – apparently in some sort of "legal" sense – in the magazine's publication.[6]  To this end, Plaintiffs argue that: (1) Ms. Scheline solicited Soiree's owner, Brandi Reiland, to be her "business partner" in *McWed*; (2) Soiree advertises in *McWed* and Ms. Reiland contributes

---

[6]  Though not specifically referenced or argued by Plaintiffs in their briefing, Idaho has codified the Uniform Partnership Act and defines as partnership as "the association of two (2) or more persons to carry on as co-owners a business for profit . . . whether or not the persons intend to form a partnership."  I.C. § 53-3-202(a).  Additionally, "[a] person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment" of/for a debt, services, wages, rent, annuity, interest on a loan, and/or sale of a business's goodwill or property.  I.C. § 53-3-202(c)(3).

**MEMORANDUM DECISION AND ORDER - 6**

written content to *McWed*; (3) Soiree "controls" *McWed* by coordinating and designing

*McWed's* appearance and layout; (4) Soiree benefits from its relationship with McWed and Ms.

Scheline; and (5) Soiree expresses control over the content that appears in *McWed*.  *See* Resp. to

MSJ, pp. 3-6 (Docket No. 45).  However, neither the purported facts nor the argument laid down

upon such facts by Plaintiffs, suffice to create a genuine issue of material fact as to whether there

existed such a "partnership" that could then be argued to create a legal partnership between

Soiree, McWed, and Ms. Scheline, so as to impose direct or vicarious liability upon Soiree for

*McWed*'s content.

> a.      *Ms. Scheline's E-Mail to Ms. Reiland*

On February 11, 2014, Ms. Scheline e-mailed Ms. Reiland about McWed's vision,

seeking input from Ms. Reiland about McWed's anticipated *McWed* magazine.  Plaintiffs

maintain that this e-mail describes a new partnership relationship between Soiree, McWed, and

Ms. Scheline.  The e-mail reads in relevant part:

> Hi Brandi!  I decided to e-mail you and just share my thoughts so that you
> could offer me feedback and hopefully mentor me a little bit. . . . .
>
> So, nearly a year ago I listened to a bride in tears telling me how hard it was
> to plan a wedding in McCall when she lived in Boise.  I had to censor my
> response because I live in McCall.  For Boise brides and brides from around
> the globe who choose McCall it is difficult because you have an added
> question to every vendor discussion[:] Do you go to McCall and how much
> extra is it?  You know as well as I do that even if the bride is a multi-
> billionaire they still care about that "how much extra?"
>
> I wanted to create a guide that first and foremast featured LOCAL vendors.
> Vendors that live and operate right here in Valley County.  I also wanted a
> complete venue guide so that others can see that there are many beautiful
> location spots.  I began the forming of McCall Wedding and Event Directory.
> We have coined McWED "WED" wedding and event directory.
>
> The last few months I have taken marketing classes and such to know how to
> sell my product (i.e. ad space).  I have begun to known my audience and have

**MEMORANDUM DECISION AND ORDER - 7**

networked with vendors from Boise to Riggins. I know this area very well and can effectively market the guide once it is produced. I am ready to go. Everything will be done here locally, the printing etc. . . . I did choose to hire out for branding and for logo creation and for putting together the website. *I have solicited Heidi from Ira & Lucy to partner with me on that end of the marketing aspect.* I felt she was a wise choice because I appreciate her sense of style and her husband in my opinion is incredibly web savvy. They are working on that end I am moving forward on this end.

*I need support from your end.* I have analyzed the market place backwards and forwards. You have successfully gained respect of all those in the industry. You have no negative reviews and I have not heard a negative word spoken about you. I want to feature "local" but I need to make sure I raise the bar of success and feature services that are above standard. I need my first issue to set the standard. I need it to become the premiere resource guide to EVERY EVENT in Valley County. I can't fail out of the gate. *I need you on board. I would like each addition to feature an editorial of a "real wedding" from an event coordinator. Advice editorial, color editorial, top 10 wedding don'ts, whatever it be. I am willing to open it up to you. I can't pay you for this first edition. I however can give you a quarter page ad and a free listing Plus the advertising from the editorial itself. I need the face of Brandi Reiland to be part of the magazine. I know I can make it successful I just need some faces attached.*

Locally there is McCall Weddings which was a failing company that Shannon purchased in December. I don't want to contribute to gossip or speak ill and so that matter is left at that. I do hope to solicit Boise vendors for ad space for event coordination. *I however hope you recognize that our friendship will certainly give you choice in advertisement placement. I want to work with you the best I can. I realize that after the magazine's success you perhaps will need me more than I you. I however currently need you more than you do me.:) That being said I am soliciting you to be my business partner and write my first editorial.* The first edition is all about Idaho. Idaho weddings, Idaho Proud, Idaho Vendors. Future articles I can tap into some of my national resources in the bridal industry and perhaps do some fashion blogs etc. . . . on the website. *Here's to a beginning and hopefully if you accept my offer a great future together in advertising.:)*

Ex. A to Swanson Decl. (Docket No. 48, Att. 1) (capitalization in original; italics added).

Apparently, Plaintiffs believe that the e-mail to Ms. Reiland evidences a joined business arrangement between McWed and Soiree in the *McWed* magazine – namely, the references to "partner" and "soliciting you to be my business partner." *Id.* But the use of such words in

**MEMORANDUM DECISION AND ORDER - 8**

isolation does not create a partnership relationship.  No reasonable reading of this email can leave more than an ingratiating attempt by  Ms. Scheline to gain the bartered assistance of Ms. Reiland, an experienced wedding and event planner, in writing editorial content for an upcoming magazine/directory in exchange for advertising space in the same publication.  Bartering does not create a partnership between the persons or entities involved in the bartering, on these facts. There is nothing in the nature of co-ownership, the sharing of profits or losses, or anything of such a nature.  At most, Ms. Scheline's purpose was to secure something of benefit for Ms. Scheline's business, in exchange for something of benefit for Ms. Reiland's business (in much the same way that, in the same e-mail, Ms. Scheline "solicited Heidi from Ira & Lucy to partner" with her on certain marketing objectives), *not* the joining together of the two people in a business partnership.  *Id*.  This distinction is also found in other of Ms. Scheline's solicitations, such as a Facebook posting which urged businesses involved in the wedding industry to become a "McWed partner," when the use of the term "partner" was nothing more than a different name for "advertiser."[7]

---

[7]  The text of the McWed Facebook posting referenced here reads:

> Today we were asked DO YOU HAVE TO BE IN THE WEDDING AND EVENT INDUSTRY TO ADVERTISE AND BE A #mcWEDPartner?
>
> The answer: NO, but your business needs to be directly related to promoting tourism through #weddingAndEvents!  We have various #LocalRestaurants, #Lodging, #Recreation, #PlacesToShop McWED is promoting #tourism and #CommunityGrowth through #weddings and #events.  We are however #RunningOutOfTime so if you are interested in being listed #HURRYUP ☺ You don't want to miss this opportunity.  Call us and we can help you! $100.00 gets you in the directory section both online as well as print.  Some of the #BestAdvertising dollars you will spend!  Call Sherry (208) 630-3723

Ex. B to Berry Decl. (Docket No. 46, Att. 2).  Along these lines, McWed also posted that it "is excited to have Melissa Shelby Photography as a #mcWEDPartner" and, separately, that "[t]he

**MEMORANDUM DECISION AND ORDER - 9**

There is no room for a reading of this e-mail as indicating the existence of, or the groundwork for, a business partnership of shared profits and liabilities between Ms. Reiland/Soiree and Ms. Scheline/McWed, such that they *jointly* be considered a single publishing unit responsible for *McWed's* content.  People use the word "partner" in all sorts of descriptions about people working toward particular goals, as was highlighted during the oral argument upon this motion.  *See, e.g.*, Tr. 14:16-22 (Docket No. 92) (attempting to distinguish "whether there's a partnership under the law or people working together on some sort of project the same way that baseball players may partner together when they go out onto the field").  Most importantly for purposes of the pending motions, the use of the word is not a legal imprimatur; rather, the elements of a partnership as the law prescribes must be present – elements which are not sufficiently alleged here.

        b.       *Soiree's Appearances in, and Ms. Reiland's Contributions to, the McWed Magazine/Directory*

Soiree and Ms. Reiland are referenced in *McWed* in several locations.  For example:

- Soiree has a full-page advertisement on *McWed's* inner cover.

- In "A Note from the Publisher," Ms. Scheline comments on Ms. Reiland's "creative spirit" and "willingness just to do," while relaying her "excite[ment] for the growth of McWed and to have [Ms. Reiland] as part of this dream," before finally expressing thanks "[t]o every McWed partner who took a gamble in the beginning not knowing how this would look and play out."

- Later in the "A Note from the Publisher" (and next to a photograph of Ms. Reiland indicating that she is an "Editorial Writer"), Danielle Snelson, President of Idaho Event Professionals and CEO of Sona Productions, writes that "Brandi and Soiree excel in amazing weddings . . . .  I've had

Idaho Event Professionals member spotlight of the week [Peace of Mind Event Planning] is a #mcWEDPartner."  *Id.*

**MEMORANDUM DECISION AND ORDER - 10**

the opportunity to work alongside her in the past and have coined her the 'wedding genius.  I love watching what she will come up with next and I know you will too!"[8]

- •    Ms. Reiland (identified as a Soiree representative) contributes several written pieces, including: "Camera Ready," "Personalize Your Wedding Detail By Detail," "The Difference: Wedding Planners, Designers, and Venue Coordinators."  Ms. Reiland also provides a highlight of the "Caitlin & Monty" wedding.

- •    Soiree is identified as the entity responsible for "Event Design and Planning" for the "Caitalin & Monty" and "Corry and Mike" weddings.

- •    Soiree and Ms. Reiland are listed twice (under "Event Coordinators" and "Event Designers") in the "Vendor Directory" with Soiree's contact information and web presence.

Ex. A to Schossberger Aff. (Docket No. 37, Atts. 11-16).

          These references, however, indicate nothing more than Soiree and Ms. Reiland being

involved in *McWed* as either (1) an advertiser; or (2) a contributor.  The record does contain

evidence that Ms. Reiland agreed to write wedding planning and feature pieces for *McWed* and,

in return, Soiree received advertising space in the magazine.  *See* Reiland Aff., ¶¶ 10-11 (Docket

No. 37, Att. 2) ("Soiree's only involvement with the *McWed* publication, print and online, was as

an advertiser. . . . .  My personal involvement with the publication *McWed* was to write some

editorial content at the request of, and under the direction of Sherry Scheline and McWed.  In

exchange, Soiree was offered free of charge a full page ad in the *McWed* publication.").  But, as

a matter of law, neither instance is evidence that Soiree and McWed *together* published *McWed*.

To the contrary, Soiree is one of the many vendors listed or advertising in *McWed*.  *S*imilarly,

--------

          [8]  It is unclear from *McWed's* "A Note from the Publisher" whether Ms. Scheline or Ms. Snelson (or both) is/are speaking on behalf of the magazine's publisher.  What is clear, however, is that Ms. Reiland is not *McWed's* publisher.

**MEMORANDUM DECISION AND ORDER - 11**

Ms. Reiland is one of *McWed's* several writers.[9]  Such connections are much too attenuated to tie Soiree to any purportedly infringing content within *McWed*.

        c.       *Soiree's Alleged Control Over the McWed Magazine/Directory*

Plaintiffs allege, matter-of-factly, that "[Soiree] is in charge of organizing the photo shoots for the magazine, further evidencing Soiree['s] control over the magazine."  Resp. to MSJ, p. 4 (Docket No. 45).  In apparent support for this statement, Plaintiffs cite to six (at times unrelated) exhibits in the record that they claim establish (or at least raise a question of) this fact. The factual basis for each such argument lacks the necessary substance to carry the alleged claim of "control" over the McWed magazine.

First, Soiree's February 28, 2014 Facebook post states: "Have you heard?  The newest McCall resource is finally here, and we're thrilled to be a part of it.  McWed will serve as inspiration and the best go-to for all things McCall!" The post also included the logo for McWed's "Media Kit 2014." Ex. A to Berry Decl. (Docket No. 46, Att. 1).  However, nothing in this post is evidence that Soiree controls *McWed* to any degree whatsoever.  Instead, the reference to "we're thrilled to be part of it" (particularly in the larger context) simply reflects

_____

    [9]  Moreover, neither Soiree's full-page advertisement nor the pieces authored by Ms. Reiland contains references to either McCall Weddings or McWed, including any of McWed's allegedly-infringing "McCallWed" mark/designations.  *See* Ex. A to Schossberger Aff. (Docket No. 37, Atts. 11-16).  Therefore, it is not accurate for Plaintiffs to state (as they do in their briefing) that "Soiree . . . appears on the inner cover of the magazine, and on the third page of the magazine in direct association with the infringing social media pages and web domains that Plaintiff McCall Weddings, LLC has complained of in its complaint, in an apparent position indicating it is a partner in the magazine."  Resp. to MSJ, p. 4 (Docket No. 45).  While the "A Note from the Publisher" on page four (not three) of *McWed* references both Ms. Reiland and Soiree (*see supra*), in addition to McWed's "McCallWed" mark/designation by virtue of the "contact us" information at the bottom of the page, there is no indication that Ms. Reiland or Soiree had anything to do with this page – it is but a note from *McWed's* "publisher," not one of its editorial writers.

**MEMORANDUM DECISION AND ORDER - 12**

Soiree taking the opportunity to extol the wedding directory magazine that contains advertising and editorial content contributed by Soiree.  Not surprisingly, in such a circumstance Soiree would want potential customers to read a copy of *McWed.*

Second, on June 23, 2014, McWed "tweeted": "@SoireeWeddings skilled, creative, unparalleled customer service! #wedding #McCallWeddings #McCallEvents@mccall."  Ex. C to Berry Decl. (Docket No. 46, Att. 3).  Plaintiffs seize upon Soiree's "re-tweeting" of this complimentary shout-out as more evidence of Soiree's control because the original message contained the allegedly infringing reference to *#McCallWeddings*.  But such a "re-tweet" is hardly evidence of control, and cannot reasonably be viewed as anything more than Soiree's re-cast into the cybermessage world of information about its own business, as mentioned by Ms. Scheline's business.  Such conduct does not bring Soiree into McWed's fold on the issue of liability.

Third, a July 1, 2014 Soiree's Facebook post attaches a copy of an article Ms. Reiland wrote for *McWed*, titled "The Difference: Wedding Planners, Designers, and Venue Coordinators."  Ex. D to Berry Decl. (Docket No. 46, Att. 4); *see also supra*.  As discussed earlier, in the factual record of this case Ms. Reiland's written contributions to *McWed* are not evidence of control over the magazine or that a business partnership exists between Soiree/Ms. Reiland and McWed/Ms. Scheline.  *See supra*.

Fourth, McWed's October 10, 2014 Facebook post reads in part:

> #Repost from @tanaphotography #DreamTeam So in life there are pinnacles and this week I have one of those!  This week the stellar #TanaPhotography captures images for my second issue of #mcWED we expand our online presence with video from @twobirdstudio and ABOVE all the team that @brandi_reiland has assembled for perfection is one that brings tears of

**MEMORANDUM DECISION AND ORDER - 13**

> happiness to my eyes! . . . .  Planning with wedding experts @brandi_reiland
> @mcwed . . . . #mcwed #soireeweddingsboise . . . .

Ex. E to Berry Decl. (Docket No. 46, Att. 5).  Plaintiffs read this post to mean that Soiree,

through Ms. Reiland, "organized a photo shoot for inclusion into the infringing *McWed*

magazine."  Resp. to MSJ, p. 4 (Docket No. 45).  Even if true, Soiree's coordination in this

limited respect reflects no actual control over McWed and its *McWed* magazine.  *See infra*.[10]

Simply put, editorial content contributions do not equal, in this factual setting, editorial content

control, or business decision control.

Fifth, on October 15, 2014, Soiree confirms via a Facebook post that it will, in fact,

participate in an upcoming photo session, stating:

> Looking forward to a big day tomorrow in McCall!  Sneak peek from
> FlowersAtWill of some of the beauties that will be a part of our photo shoot!
> Can't wait to spend the day with some of our favorites!  Stay tuned for peeks
> behind the scene all day tomorrow right here and on our Instagram!
>
> Flowers At Will is coming for you tomorrow McCall Idaho!!!  Let's do this
> Brandi Reiland . . . Tana Ruud Urizar . . . Elizabeth EB Belts Kauffman . . .
> Sherry Scheline!!! #timetomakemagic

Ex. F to Berry Decl. (Docket No. 46, Att. 6).  As with McWed's earlier post on what appears to

be the same issue, organizing a photo shoot (even if for *McWed* ) does not translate into a legal

business partnership with McWed or somehow demonstrate Soiree's control over the *McWed*

magazine.  *See supra*.

---

[10] It is worth pointing out here that this post also mentions "McWed partners Amy's
Whole Foods Catering and Tate's Rents . . . ."  Ex. E to Berry Decl. (Docket No. 46, Att. 5).
Again, it would be incorrect to say that, in claiming both Amy's Whole Foods Catering and
Tate's Rents to be McWed's partners, they are partners with McWed in the legal sense.  *See
generally supra*.

**MEMORANDUM DECISION AND ORDER - 14**

Finally, McWed's January 10, 2015 Facebook post introduces the Winter 2015 edition of *McWed* via the magazine's cover photograph. Ex. G to Berry Decl. (Docket No. 46, Att. 7). In the content margin of the post, McWed says that various contributors to the edition, including Soiree, were involved with "Coordination and Design." *Id.*[11] What such terms exactly mean by way of Soiree's involvement in *McWed* is not immediately apparent, but Plaintiffs seem to want the Court to take it as evincing Soiree's charge over the magazine. Even with such an expansive interpretation of these terms, coordinating and designing *McWed's* layout does not evidence control over the magazine or the business decisions of McWed.

    d.  *McWed's and Soiree's "Mutual Benefits" of the Partnership*

Relying on a phone conversation between Ms. Scheline and Joshua Kuhnel in which Ms. Scheline indicated that Ms. Reiland encouraged her to attend an event to defend "our positions in [McCall" and that "we are relying on you," Plaintiffs say that this claimed "mutual benefit" amongst McWed and Soiree indicates a partnership between the two. *See* Resp. to MSJ, p. 5 (Docket No. 45) (citing Ex. To Kuhnel Decl. (Docket No. 47, Att. 1)). It does not. As with any advertiser, Soiree may have stood to benefit (in the form of potential customer inquiries) from circulation of *McWed*. However, that potential benefit (the same benefit sought by any advertiser, in any sort of advertising medium) is not evidence that Soiree controlled McWed or had a partnership with McWed. This was discussed during oral argument:

> Court:   If . . . Ms. Scheline had referred to everybody that was in the
>        wedding business in Valley County as my partners to make

---

[11] It is unclear whether, or to what extent, the Winter 2015 edition of *McWed* is a component of Plaintiffs' claims against McWed, Ms. Scheline, and Soiree. As to the Summer 2014 edition of *McWed* (included in the record and reflecting the bases for the majority of Plaintiffs' claims), United Graphic Design advertised in the magazine and stated that "McWed trusted us to design and print this entire magazine." Ex. A to Schossberger Aff. (Docket No. 37, Atts. 11-16).

**MEMORANDUM DECISION AND ORDER - 15**

great weddings for every bride that comes across the border, does that create a partnership – business partnership relationship that somehow makes them all amenable to suit?

Swanson: No, Your Honor.

Court: Okay. So be as precise as you can be about what makes this particular relationship different than say anybody who advertised in the *McWed* magazine was somehow a partner, for instance.

Swanson: Because this went a step above just advertising in the magazine. In just an advertisement, an advertiser is providing an –

Court: Do you have any proof that Soiree was to receive any profit from the advertising revenues that the publication was bringing in?

Swanson: Not the revenues but referrals, yes.

Court: As was every other advertiser, right?

Swanson: Correct.

Court: That's the whole business model as I understand it.

Tr. 15:21-16:17 (Docket No. 92). When pressed further, Plaintiffs' counsel suggested that Soiree was unique, owing to the fact that Ms. Reiland was a "preferred editorial writer . . . was given a place of prominence in the magazine . . . [and] was asked to provide a large variety of input into the magazine's functions." *Id*. at 16:22-25. These arguments are lacking, as already discussed. *See supra*. So too is any notion that, by merely being featured in *McWed*, Soiree has partnered up with its creator, McWed. Ultimately, this means that the above-described conversation between Ms. Scheline and Mr. Kuhnel is of little consequence (on *this* issue, but not necessarily the issue of sanctions (*see infra*)), as Plaintiffs' counsel acknowledged in his back-and-forth with the Court:

**MEMORANDUM DECISION AND ORDER - 16**

| Swanson: | We also had the discussion that was recorded by Mr. Kuhnel claiming that Sherry Scheline had stated that Brandi Reiland was to defend their positions in McCall. |
|---|---|
| Court: | This is the recording that Ms. Scheline was – it sounded like she was upset after some gathering that there was. |
| Swanson: | Yes. |
| Court: | That's proof of a partnership between these folks? |
| Swanson: | It's not 100 percent proof but it was enough under Rule 11 to file a Complaint between all the actions together. |

*Id*. at 16:25-17:12.  Simply put, an advertiser's secondary benefit in an advertising magazine is

not indicative of the former's control over the latter and, thus, does not a partnership make.

> e.    *Soiree's Alleged Input on Advertisers in the McWed Magazine/Directory*

Citing to an e-mail exchange between Ms. Scheline and Ms. Reiland, Plaintiffs claim that

"Soiree has express control over who the partnership chooses to be in the *McWed* magazine"

because "Soiree . . . set[ ] forth that three wedding planners is enough for inclusion into the

*McWed* magazine."  Resp. to MSJ, p. 5 (Docket No. 45) (citing Ex. U to Swanson Decl. (Docket

No. 48, Att. 21)).  This is not true when actually examining that exchange.

For instance, Plaintiffs leave out the fact that Ms. Reiland initially reached out to Ms.

Scheline, *asking* "what other event planners will be advertising in the publication?"  *Id*.  In

response, Ms. Scheline identified the anticipated event planners before stating back to Ms.

Reiland that, "[i]f you think I need more than the three I can actively pursue more."  *Id*.  At that

point, Ms. Reiland says that "three event planners is more than enough" and then thanked Ms.

Scheline "again for including us."  *Id*.  These e-mails reflect only that Ms. Reiland *agreed* with

Ms. Scheline's plan to have three event planners advertise in *McWed*.  Ms. Reiland therefore

**MEMORANDUM DECISION AND ORDER - 17**

never controlled that decision as Plaintiffs imply here.  Thus, any argument that Soiree

controlled the alleged partnership between it and McWed by virtue of these e-mails is overstated.

      With all this in mind, Soiree did not improperly use or falsely designate any of Plaintiffs'

claimed marks.  No evidence exists that Soiree itself engaged in any such conduct on its own.

To the extent Plaintiffs' Lanham Act claim against Soiree is premised upon McWed's conduct in

publishing the *McWed* magazine, there is also no evidence that Soiree and McWed were legal

partners in the *McWed* product, in turn, making Soiree vicariously liable for McWed's conduct.

Soiree advertised in and contributed to *McWed*; the record speaks to nothing more than that.

*See, e.g.*, Reiland Aff., ¶¶ 4-7 (Docket No. 37, Att. 2) ("Soiree is not a member of and has no

financial involvement with the business or operations of [McWed]"; "Soiree does not exercise

any amount of control over McWed, its owners, or employees"; "Soiree is not in the business of

publishing a wedding and event directory"; and "Soiree does not exercise any amount of control

over the *McWed* publication.  Soiree does not receive any money from the *McWed*

publication.").[12]  Absent evidence of Soiree's actual control over McWed, Plaintiffs' Lanham

---

    [12]  This same reasoning applies even if Plaintiffs assert a claim for contributory trademark infringement against Soiree (the Court takes no position on whether they have, in fact, made such a claim in their Amended Complaint).  To be liable for contributory trademark infringement, Soiree must have "(1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied."  *Perfect 10, Inc. v. Visa Intern. Service Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982)).  "When the alleged direct infringer supplies a service rather than a product, under the second prong of this test, the court must 'consider the extent of control exercised by the defendant over the third party's means of infringement.'  For liability to attach, there must be 'direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark.'"  *Id.* (quoting *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)).  Here, Plaintiffs cite to no affirmative acts by Soiree suggesting that McWed

**MEMORANDUM DECISION AND ORDER - 18**

Act claim against Soiree cannot stand as a matter of law and must be dismissed.[13]   Soiree's

Motion for Summary Judgment is granted in this respect.

       3.    <u>Plaintiffs' State Law Claims Against Soiree Must Be Dismissed</u>

      Each of Plaintiffs' state law claims against Soiree hinges upon Soiree's alleged

involvement in the *McWed* publication:

- Second Claim: Plaintiffs assert that "Defendants' acts described above constitute infringement of Plaintiff McCall Weddings's common law rights in its McCall Weddings trade name and service mark." First Am. Compl., ¶ 28 (Docket No. 5).  Up to that point in the pleading, Soiree's alleged conduct amounted to it (1) "publishing a wedding event directory" and (2) "ha[ving] participated directly in the publication of the wedding and event planning magazine entitled *McWed* both on the Internet and in traditional print format . . . ."  *Id*. at ¶¶ 7 & 15.

- Fourth Claim: Plaintiffs assert that "Defendant McWed in conjunction with Defendant Soiree [ ] and Defendant Sherry Scheline published a print version of *McWed* - McCall Wedding & Even Directory and an on-line version of the *McWed* - McCall Wedding & Event Directory."  *Id*. at ¶ 38.

- Fifth Claim: Plaintiffs assert that "Defendant McWed in conjunction with Defendant Soiree [ ] and Defendant Sherry Scheline published a print version of *McWed* - McCall Wedding & Even Directory and an on-line version of the *McWed* - McCall Wedding & Event Directory."  *Id*. at ¶ 48.

Soiree, however, did not publish *McWed*.  *See supra*.  Therefore, there is no predicate foundation

for Plaintiffs' state law claims against Soiree.  *See* Mem. in Supp. of MSJ, p. 11 (Docket No. 38,

---

infringe McCall Weddings's claimed marks, must less induce McWed to do so.  Also, there is no evidence that Soiree ever provided infringing product to McWed (*see supra*), had actual or constructive knowledge of McWed's alleged infringement (Plaintiffs incorrectly assume that Ms. Scheline's mere mention that "[l]ocally there is McCall Weddings" in her February 11, 2014 e-mail to Ms. Reiland, represents Ms. Reiland learning of McWed's alleged infringement prior to submitting editorial content to *McWed* (Resp. to MSJ, pp. 4-5 (Docket No. 45))), or had the requisite "direct control" over *McWed* (*see supra*).

    [13]   Though not an independent basis for dismissing Plaintiffs' Lanham Act claim against Soiree, this is consistent with the arguments made within Plaintiffs' Motion for Preliminary Injunction.  There, Plaintiffs' arguments revolved around McWed's conduct, not Soiree's.  Indeed, Soiree did not even submit a response to Plaintiffs' Motion for Preliminary Injunction.

**MEMORANDUM DECISION AND ORDER - 19**

Att. 1) (Soiree arguing that Plaintiffs' state law claims "are also susceptible to the same failings" as Plaintiffs' Lanham Act claim).[14]  Plaintiffs' state law claims against Soiree should therefore be dismissed.  Soiree's Motion for Summary Judgment is granted in this respect.

      4.      <u>Soiree's Counterclaims Against Plaintiffs are Mooted by the Dismissal of Plaintiffs' Underlying Claims Against Soiree</u>

After Plaintiffs filed their First Amended Complaint, Plaintiffs' counsel and Soiree's counsel engaged in settlement discussions speaking to Soiree's potential release from this lawsuit.  There is substantial back-and-forth between these parties as to what transpired during these discussions and, important here, whether any agreement was in actually reached.  Suffice it to say, Soiree strongly believes that a settlement agreement was reached, asserting two related counterclaims against Plaintiffs, and now moving for summary judgment on those counterclaims; Plaintiffs, on the other hand, are equally resolute in their belief that no settlement agreement was ever reached.  *Compare* Mem. in Supp. of MSJ, pp. 4-6, 13-17 (Docket No. 38, Att. 1), *with* Resp. to MSJ, pp. 6-9 (Docket No. 45).

Practically speaking, Soiree's counterclaims look to enforce this disputed settlement agreement for the purpose of insulating Soiree from Plaintiffs' claims – in essence, dismissing Plaintiffs' claims against Soiree.  *See, e.g.*, Countercl., ¶¶ 17 & 22 (Docket No. 15) (alleging that Soiree is entitled to (1) judgment declaring that parties entered into valid and enforceable settlement agreement, and (2) order requiring Plaintiffs to comply with settlement agreement and

---

[14]  Plaintiffs do not respond to this argument in their opposition to Soiree's Motion for Summary Judgment, or to Soiree's alternate argument that, without the Lanham Act claim, the Court has no supplemental jurisdiction over the remaining state law claims.  *See generally* Resp. to MSJ (Docket No. 45).  The Court need not address whether supplemental jurisdiction exists over Plaintiffs' state law claims.

**MEMORANDUM DECISION AND ORDER - 20**

dismiss their claims against Soiree).  Plaintiffs' claims against Soiree have now been dismissed.

*See supra*.  Without those claims, the impetus (and import) of Soiree's counterclaims no longer

exist.  *See, e.g.*, Reply in Supp. of MSJ, p. 9, n.4 (Docket No. 59) ("Albeit [sic] the Court should

grant Soiree's Motion for Summary Judgment on Plaintiffs' unfounded claims and render

Soiree's counterclaim moot, Soiree will additionally reply [on sub-issue relating to existence and

enforcement of alleged settlement agreement].").  Because Soiree's counterclaims are now moot,

Soiree's Motion for Summary Judgment is denied in this respect.[15]

     5.     <u>This is Not a Case Where Soiree's Costs and Attorneys' Fees are Reimbursable Under the Lanham Act</u>

A district court has discretion to award attorneys' fees to a prevailing party under the

Lanham Act, but only in "exceptional cases."  *See* 15 U.S.C. § 1117(a) ("The court in

exceptional cases may award reasonable attorney fees to the prevailing party."); *Gracie v.*

*Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000).  The Ninth Circuit construes the "exceptional

circumstances" requirement narrowly.  *See id*. (noting that Ninth Circuit has interpreted

---

[15]  Though not necessary to the Court's resolution of the at-issue motions, the undersigned adds that, as to whether a settlement agreement existed between Soiree and Plaintiffs in the first place, issues of fact preclude an affirmative finding as a matter of law. While it appears that the parties' counsel seemed to be in initial agreement over releasing Soiree from the action in exchange for Soiree's production of certain materials, things definitely broke down before all the parties actually signed a formal settlement agreement and release.  *See* Exs. D-I to Schossberger Aff. (Docket No. 37, Atts. 19-25).  It may be, as Soiree contends, that there was mutual assent to the terms of the eventual settlement agreement before any snafu in formally executing the same took place.  However, that possibility is not without related questions – namely, what, if anything, took place after this initial exchange that either prevented the signing of an agreement supposedly consummating any preceding negotiation, or unwound any previously-understood agreement in theory?  Reasonable minds could differ over the significance of these questions and, thus, cannot be definitively resolved in Soiree's favor at this stage of the litigation.  *See, e.g.*, *Thompson v. Pike*, 838 P.2d 293, 299 (Idaho 1992) ("A distinct understanding common to both parties is necessary in order for a contract to exist.  It is a question of fact whether mutual assent exists.") (internal citations omitted).

**MEMORANDUM DECISION AND ORDER - 21**

"exceptional circumstances" requirement "rather narrowly" in its decisions).  "Exceptional circumstances can be found when the non-prevailing party's case is groundless, unreasonable, vexatious, or pursued in bad faith."  *Id.* (internal quotation marks omitted).  Soiree now argues that is action represents such an "exceptional case."  *See* Mem. in Supp. of MSJ, pp. 17-18 (Docket No. 38, Att. 1).  After a review of the record, the Court disagrees.

As previously stated, Soiree's Motion for Summary Judgment focused upon a single element of Plaintiffs' Lanham Act claim – whether Soiree improperly used or falsely designated any of Plaintiffs' purported marks by virtue of its involvement with the allegedly infringing *McWed* magazine/directory.  *See supra*.  Although the Court has determined here that (1) there is no Soiree/McWed partnership, and (2) Soiree did not control *McWed's* publication, this does not mean *ipso facto* that the Lanham Act requires an award to Soiree for its costs and attorneys' fees.  Otherwise, any prevailing party on a Lanham Act claim would be entitled to recover its costs and attorneys' fees.  By its terms, the Lanham Act requires more.  In the Court's mind, this case was not so patently groundless, unreasonable, vexatious, or pursued in bad faith as to constitute the sort of "exceptional case" that the Lanham Act requires.

Despite Soiree's staunch arguments to the contrary, Plaintiffs' Lanham Act claim against it was not obviously frivolous from the get-go.  Soiree's involvement as a featured advertiser in and editorial contributor to *McWed*, coupled with the discussed e-mails, social media postings, and correspondence orbiting that reality (*see supra*), paint Soiree in a different light than *McWed's* typical advertisers/contributors.  Such differences, however, do not overcome the shortcomings of Plaintiffs' Lanham Act claim against Soiree – they represent smoke, but no real fire.  These nuances, while not preventing the entry of Soiree's Motion for Summary Judgment

**MEMORANDUM DECISION AND ORDER - 22**

in its substantive respects, nonetheless foreclose any argument that Plaintiffs' assertion of a

Lanham Act claim against Soiree was absolutely inappropriate or of the exceptional kind that

would justify Soiree's recovery of its costs and attorneys' fees now.  For these reasons, Soiree's

Motion for Summary Judgment is denied in this respect.

**B.      Soiree's Motion for Sanctions Pursuant to Rule 11 (Docket No. 37)**

Rule 11(c) describes the nature and mode of sanctions reserved "for the rare and

exceptional case where the action is clearly frivolous, legally unreasonable or without legal

foundation, or brought for an improper purpose."  *Operating Eng'rs Pension Trust v. A-C Co.*,

859 F.2d 1336, 1344 (9th Cir. 1988).  A filing is frivolous if it is "both baseless and made without

a reasonable and competent inquiry."  *Townsend v. Homan Consulting Corp.*, 929 F.2d 1358,

1362 (9th Cir. 1990).  Rule 11 sanctions are discretionary and represent "an extraordinary

remedy, one to be exercised with extreme caution."  *Operating Eng'rs Pension Trust*, 859 F.2d

at 1344; *Meyer v. Bank of America, N.A.*, 2012 WL 4470903, *12 (D. Idaho 2012) ("A district

court has the discretion in appropriate circumstances to impose sanctions under Rule 11 . . . .").

As with its request for costs and attorneys' fees within its Motion for Summary

Judgment, Soiree separately moves for sanctions under Rule 11, arguing that Plaintiffs' Lanham

Act claim against it "is both frivolous and harassing."  Mem. in Supp. of Mot. for Sanctions, p. 2

(Docket No. 37, Att. 1).  Soiree contends that sanctions are appropriate here because (1) no good

faith basis existed to bring a Lanham Act claim against it for simply advertising in, and

contributing to, the *McWed* magazine/directory; (2) Plaintiffs tried to leverage Soiree into paying

$20,000 to dismiss the suit, despite conceding that their dispute was really with McWed, not

Soiree; and (3) Plaintiffs falsely denied material allegations within Soiree's counterclaims

**MEMORANDUM DECISION AND ORDER - 23**

concerning the existence of the alleged settlement agreement.  *See id.* at pp. 2-3, 9-16.  Again, after reviewing the record, the Court disagrees.

Soiree's frustration is understandable; still, that cannot form the basis for imposing sanctions upon Plaintiffs.  Although this decision makes clear that the Court is not persuaded by Plaintiffs' case against Soiree, and chooses to dismiss Plaintiffs' claims in a summary judgment context, the Court is not persuaded that the filing of such claims constitutes a violation of Rule 11.  Plaintiffs believed that Soiree had more to do with *McWed* than it actually did.  Plaintiffs have likely been viewing the facts of this case through rose-colored glasses, a perspective which merits a recalibration.  However, any misplaced optimism or lack of dispassionate assessment on their part does not mean that the filing against Soiree was made in the total absence of any supporting theory or fact, or in the face of clearly conflicting evidence.  *See supra.*  This means that granting summary judgment in Soiree's favor, yet denying Soiree's request for sanctions against Plaintiffs, are not mutually exclusive.  *See MetLife Bank, N.A. v. Badostain*, 2010 WL 5559693, *7 (D. Idaho 2010) ("Although MetLife's Complaint may not contain sufficient evidence to withstand a motion for summary judgment, it does contain sufficient evidence to avoid sanctions under Rule 11 . . . .").  Soiree's Motion for Sanctions is denied.

## III.  **ORDER**

Based on the foregoing, IT IS HEREBY ORDERED THAT:

1.      Soiree's Motion for Summary Judgment (Docket No. 38) is GRANTED, in part, and DENIED, in part, as follows:

a.      Plaintiffs' claims for (1) unfair competition and false designation of origin in violation of the Lanham Act ("First Claim"); (2) common law trademark infringement ("Second Claim"); and (3) unfair competition and false advertising in violation of Idaho Code

**MEMORANDUM DECISION AND ORDER - 24**

sections 48-603(1) and 48-603(2) ("Fourth Claim" and "Fifth Claim") are DISMISSED.  In these respects, Soiree's Motion for Summary Judgment (Docket No. 38) is GRANTED;

        b.     Soiree's counterclaims are denied as moot.  In this respect, Soiree's Motion for Summary Judgment (Docket No. 38) is DENIED; and

        c.     Soiree's request for costs and attorneys' fees is denied.  In this respect, Soiree's Motion for Summary Judgment (Docket No. 38) is DENIED.

     2.     Soiree's  Motion for Sanctions Pursuant to Rule 11 (Docket No. 37) is DENIED.

*Still pending before the Court are (1) Plaintiffs' Motion for Preliminary Injunction (Docket No. 24), (2) Defendant McWed's and Ms. Scheline's Motion for Order Limiting and Protecting Defendants From Excessive Discovery and Request for Sanctions (Docket No. 68), and (3) Plaintiffs' Motion to Compel (Docket No. 75).  On July 8, 2015, the parties have a settlement conference scheduled with U.S. Magistrate Judge Mikel H. Williams.  With Soiree's effective dismissal from the action there should be an opportunity for a focused and hopefully successful settlement conference amongst the remaining parties.*

*In the event the parties do not reach a settlement of the action at that time, the Court will immediately take up the three pending motions (in the event those motions have not since been resolved in either whole or in part).  As indicated by the Court from the bench at the conclusion of the April 13, 2015 hearing (see e.g., Tr. 65:8-72:5 (Docket No. 92)), the parties are on notice that as part of resolving the pending discovery motions, the Court will order the reimbursement of certain costs/fees to the prevailing party, and possibly include the requirement that a requesting party pay the costs of the work required to be done in order to*

**MEMORANDUM DECISION AND ORDER - 25**

*respond to certain of the propounded discovery, particularly where such propounded discovery is arguably disproportionately broad in comparison to the potential benefit.*



DATED:  **June 23, 2015**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 26**